PEOPLE v FISHER

Docket No. 167938. Submitted December 6, 1995, at Detroit. Decided
November 15, 1996, at 9:10 A.M. Leave to appeal sought.

Charles Fisher was convicted by a jury in the Detroit Recorder's
Court, Vera Massey Jones, J., of inciting perjury and found not
guilty of attempted obstruction of justice. The defendant was sen-
tenced to six months to five years in prison. The charges were
based on the defendant's plan, developed while the defendant was
imprisoned in Jackson following his second conviction of the mur-
der of his wife and while his appeal of the second conviction was
pending, which conviction eventually was reversed and the matter
was remanded to the Detroit Recorder's Court for a new trial, to
have a fellow inmate give false testimony in legal proceedings in
the Detroit Recorder's Court with regard to the murder case. The
defendant appealed, alleging that venue was not proper in Wayne
County because all the acts giving rise to the charges occurred in
Jackson County, that hearsay evidence was admitted improperly,
and that the prosecution engaged in misconduct.

The Court of Appeals *held*:

1. The trial court did not err in finding that venue of the
attempted obstruction of justice count was proper in Wayne
County, where the proceedings intended to be affected were pend-
ing. The prosecution of both counts in Wayne County was proper.
In applying MCL 762.8; MSA 28.851, the statute concerning a felony
consisting of more than one act, the place of the commission of an
act is not limited to the place of the defendant's physical presence.
An act that has effects elsewhere that are essential to the offense
is, in effect, committed in the place where the act has its effects.

2. The trial court did not err in allowing assistant prosecutor
Michael Reynolds to relate testimony from the defendant's prior
murder trial because it was not offered to prove the truth of the
matter asserted and, thus, was not hearsay.

3. The testimony of witnesses Eric Docket and Christine Smith
was not hearsay pursuant to MRE 801(d)(1)(B). The admission of
the testimony, if erroneous, was harmless.

4. Error requiring reversal did not occur as a result of the testimony of assistant prosecutor Reynolds or the prosecutor's comments regarding the testimony of witness Eric Docket.

5. The failure of the Court of Appeals to review the issue whether the prosecutor engaged in misconduct by commenting on evidence that was not presented to the jury, to which alleged error the defendant did not object at trial, will not result in a miscarriage of justice.

6. The credibility of witness Ricardo Bush was properly left to the determination of the jury, the jury was instructed fairly, and the defendant was properly charged.

Affirmed.

HOLBROOK, JR., J., concurring, wrote separately to distinguish this case from *People v Meredith (On Remand)*, 209 Mich App 403 (1995), in which he dissented from the majority's holding that MCL 762.8; MSA 28.851 provided a basis for venue in the prosecution of a conspiracy charge by the mere fact of a coconspirator's travel through the prosecuting county. In this case, the nexus between the defendant's felonious acts and the prosecuting county was not merely incidental or fortuitous, but, rather, was direct and substantial.

1. CRIMINAL LAW — VENUE — ATTEMPTED OBSTRUCTION OF JUSTICE.

Venue with regard to a charge of attempted obstruction of justice is proper in the county in which the legal proceeding intended to be affected is pending even though the alleged acts occurred in a different county; the offense is committed where there is an act done with the intent to obstruct justice in the county where the proceeding is pending; there is no meaningful distinction regarding venue based on whether the defendant was successful in actually obstructing justice (MCL 750.92, 750.505; MSA 28.287, 28.773).

2. CRIMINAL LAW — FELONIES CONSISTING OF MORE THAN ONE ACT.

An act that has effects elsewhere that are essential to a felony offense is, in effect, committed in the place where the act has its effects for purposes of the statute concerning the prosecution of a felony consisting of more than one act; in applying the statute, the place of the commission of an act is not limited to the place of the defendant's physical presence (MCL 762.8; MSA 28.851).

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *John D. O'Hair*, Prosecuting Attorney, *Timothy A. Baughman*, Chief of Research,

Training, and Appeals, and *Joseph A. Puleo*, Assistant Prosecuting Attorney, for the people.

*Kenneth M. Mogill* and Charles R. Fisher, in propria persona.

Before: WHITE, P.J., and HOLBROOK, JR., and P. D. SCHAEFER,* JJ,

WHITE, P.J. Defendant, Dr. Charles Fisher, was tried on charges of inciting perjury, MCL 750.425; MSA 28.667, and attempted obstruction of justice, the latter offense charged pursuant to MCL 750.505; MSA 28.773, which provides for punishment of offenses indictable at common law, and MCL 750.92; MSA 28.287, the statute regarding attempts to commit crime. A jury convicted defendant of inciting perjury. He appeals, challenging whether venue was proper in Wayne County, the admission of evidence claimed to be hearsay, and the prosecutor's conduct. We affirm.

I

It is undisputed that defendant's wife was murdered in 1984 in the home she shared with defendant in Wayne County. Defendant was tried and convicted of that murder in 1984 in Detroit Recorder's Court. The conviction was set aside by the trial court and defendant was retried and convicted in 1988. Defendant was then imprisoned in Jackson from April 1988 to June 1990, during which time his appeal of the second conviction was pending and the incidents underlying the instant case occurred. On November 25, 1991, defendant's second conviction was reversed by the Michigan Supreme Court and the case was

---

* Circuit judge, sitting on the Court of Appeals by assignment.

remanded to the Detroit Recorder's Court for a new trial. *People v Fisher*, 439 Mich 884; 476 NW2d 889 (1991).

In January 1993, defendant was charged in the instant case by a two-count felony complaint, which stated, inter alia, that defendant had been convicted and was sentenced to life in prison on April 1, 1988, and that while confined at Jackson Prison between 1988 and 1990 defendant had an appeal pending, which included a remand to the Detroit Recorder's Court for evidentiary hearings conducted in 1989, as well as other postconviction motions heard in 1988 and 1989. With regard to the inciting perjury count, the complaint stated that defendant knowingly attempted to persuade, incite, and procure R.B. (Ricardo Bush) to swear to a false affidavit for use by defendant's appellate attorney in legal pleadings that would either further defendant's appeal of his murder conviction or be used to help him obtain a new trial. The complaint stated under the attempted obstruction of justice count that defendant attempted to interfere with the orderly administration of justice by "knowingly, willfully, and corruptly attempting to interfere with the proper and legitimate criminal investigation and prosecution of the murder case of *People v Charles Ray Fisher* [Wayne County Circuit Court No. 88-500087]."

At the June 1993 trial of this case, Ricardo Bush testified that he was an inmate at Jackson State Prison in 1988, where he met defendant while both were in quarantine before being placed inside the prison. Bush was serving time for violating probation and breaking and entering and was a convicted fourth-offense habitual criminal. According to Bush,

he and defendant discussed why they were in prison, exchanged presentence reports, and defendant initially told him he did not commit the murder, but, rather, he had been home by himself when some "black guys" came in, knocked him out, and tied him up, later doing the same to his wife when she came home. Bush testified that he told defendant that defendant should either find out who actually murdered his wife or pay someone to confess to the crime. After both men left quarantine, Bush was sent to maximum security, where he received a note from defendant asking him to find someone who would do what they had talked about. Bush was later placed in the same security level as defendant and saw defendant in the recreation yard, where defendant asked Bush if he knew anyone who would say he broke into the Fisher house.

Bush testified that he told defendant that he would do it for $1,500, and defendant agreed. Bush told defendant that $500 was for Bush, and $1,000 was for his rap partner, Anthony Smith. Bush testified that, in reality, he did not have a rap partner, and had lied to defendant. The arrangement was that defendant would pay Bush in dollar tokens, which inmates could draw every two weeks.

Bush testified that defendant started giving him details of the house, "things that only the police and the criminal would know." Bush testified that defendant described his Canton home as being ranch-style, with a swimming pool, and bushes in the front. He told Bush that there were beer cans left at the scene of the crime, a point only the police and person who broke in would know, and which was not in the police reports. Bush testified that over the course of a

few months, defendant told him other details of the
crime and crime scene, and gave him a sketch of the
layout of the home. Bush no longer had the sketch.
Defendant told Bush that the Fisher dog left from the
garage, that there were boxes in the garage, and that
there was a beer can left on the counter. He also told
him about the layout of the house. Bush testified that
defendant told him to say that a "white guy" had
driven Bush and Smith out to the home during the
day, that they returned that night and, after the crime,
left the defendant's truck near Tiger Stadium. Bush
testified that defendant told him that the perpetrators
had entered through an unlocked door, that when
defendant came out of the bedroom, the perpetrators
had jumped him and taped him up, and that the per-
petrators had then sat around drinking and ransacked
the house. When defendant's wife arrived, the perpe-
trators did the same to her, robbed her of money and
plane tickets in her purse, and drove away in defend-
ant's truck after leaving her on the living room floor.

Bush further testified that the arrangement was
that, in return for the $1,500, Bush would sign an affi-
davit under oath and send it to defendant's attorney,
the affidavit stating that Bush had committed the
crime and did not want to see the wrong guy go to
jail. Bush testified that, eventually, defendant admit-
ted that he was responsible for killing his wife and
that he had done it because she was running off and
leaving him for a cousin. Bush testified that defendant
told him that if Bush confessed to the crime he would
be convicted only of manslaughter and would not
receive an additional sentence. Bush said he received
about three hundred dollar tokens from defendant.
He further testified that Christina Smith, a pen buddy

of his, was aware of the arrangement between Bush and defendant, as were two inmates, Eric Docket and William Mundy. Bush testified that as a result of his agreement with the prosecutor to testify, he would receive three years off the ten- to fifteen-year sentence he was serving.

Bush said that he last received money from defendant in 1988, that he and defendant eventually broke ties because Bush was not going to sign the affidavit and they stopped running into each other, and that he had no further contact with defendant after he left Jackson Prison. Bush testified that he next heard about defendant when he read a newspaper article stating that defendant had won his appeal and that he, Bush, then wrote the Wayne County Prosecutor because he had been in jail for ten years and seeing a man he knew had killed somebody get out of jail "didn't sit well" with him. Bush testified that he received no response to his first letter, which he had sent to the wrong address, and that he wrote a second letter in which he mentioned the beer cans. He was eventually taken from prison to speak to two prosecutors and a detective. Bush testified that he asked the prosecutor for two years off his sentence for good time, which habitual offenders are not entitled to, and sentence credit for the year he served in the county jail for violating probation. The prosecution had Bush read into the record the agreement he signed with the prosecutor's office.

On cross-examination, Bush testified that defendant never gave him an affidavit to sign, that Bush never wrote out a statement, never submitted anything to a lawyer, never signed anything, and had nothing in writing.

Eric Docket testified that in 1988 he was a prisoner at Jackson State Prison and knew Bush. He knew defendant "somewhat." He was taken from the prison around January 1993 and was asked questions by representatives of the Wayne County Prosecutor's office, some of which he responded to. He testified that he was serving a life sentence for second-degree murder and armed robbery and that he had delivered a message to defendant from Bush asking about a "packet," which he was told was about some land. Defendant responded by saying that he would see Bush on "draw day," the day inmates received money. Docket testified that Bush said he was "squeezing" defendant for money in exchange for a promise to admit to murdering his wife. Docket said Bush never intended to confess to murdering defendant's wife. Docket testified that Bush told him that defendant had killed his wife by suffocating her with some duct tape. He testified that he did not want to be in court because it was risky and that, in exchange for his testimony, the prosecutor's office promised him a letter of recommendation. On cross-examination, Docket testified that Bush admitted to him that it was Bush's idea to "squeeze" defendant for money. Docket said he never saw defendant give Bush any tokens and never saw defendant meet with Bush. On redirect examination, Docket testified that he was asked to provide a written statement before meeting with the prosecutor's office, but that he would not give a statement until after he had talked to Bush because he "wasn't going to say nothing" until he knew if Bush was going to be charged. Docket testified that he saw Bush with a sketch that Bush said was of defendant's house.

Michael Reynolds, the Assistant Wayne County Prosecutor who had prosecuted defendant at his second murder trial in February and March 1988, testified that defendant was convicted of first-degree murder and was sentenced on April 1, 1988. In May, defendant filed a motion to extend the time to file a new trial motion in the trial court, after which an extension was granted until August 31, 1988. When the prosecutor asked Reynolds whether, on August 31, 1988, the case was pending in Wayne County for purposes of defendant's motion for a new trial, defense counsel stated he would so stipulate. Reynolds explained that even though defendant had been convicted and sentenced, the trial court was still in control of the case and was being asked to make decisions regarding the case. Reynolds testified that he learned that defendant's conviction was overturned around Thanksgiving 1991 and that subsequently the case was again pending in Wayne County.

Reynolds testified that he first became aware of the instant allegations after the prosecutor's office received a letter from Bush on November 10, 1992, that was routed to Reynolds and eventually led to the initiation of the instant case. Reynolds stated that the prosecutor's office and Bush entered into a signed agreement on January 21, 1993, according to which the prosecutor would recommend to the sentencing court that Bush receive credit for time served and disciplinary credits.

Reynolds testified that he went to the Fisher home in January 1988. He described the home to the jury, over objection. Reynolds testified that the home was in a subdivision in Canton, had a swimming pool, sat far back from the road and at a good distance from

other homes, with shrubs and bushes in the front, and
was ranch-style. Reynolds then testified that he was
present during the entire 1988 trial, and he was asked
numerous questions, over objection, in response to
which he was permitted to summarize testimony from
defendant's second murder trial. Reynolds testified
that there had been testimony about the Fishers' dog,
that braided rope was found in the garage, that there
was access through the garage to the family room,
that there was a beer can left on the counter, that a
neighbor had seen defendant out and about on the
evening in question with two much darker men in
defendant's red pickup truck that was being driven by
defendant, that the pickup truck had been found later
in southwest Detroit near the Ambassador Bridge,
that there was no indication in the physical proofs
that the home had been ransacked, that a large
amount of money had been left in a dresser drawer in
the master bedroom, and that Mrs. Fisher was found
on the living room floor and had died of anoxia
caused by duct tape that had been placed over her
nose and mouth. Defense counsel requested a sidebar
conference, the jury was excused, and the court
reminded the prosecutor that the murder case was
not being tried and that the court was permitting
Reynolds' testimony to show the statements were
made, not for the truth of the matters asserted. Rey-
nolds was further permitted to testify that there had
been testimony at defendant's second trial that
defendant's wife had worked on the evening she was
murdered, that she was found in a nurse's uniform,
and that the fingerprints found did not belong to any-
one in the criminal justice system.

Christina Smith testified that she had been corresponding with Bush since 1988. She testified that Bush told her that defendant was "looking out for" him, which she interpreted to mean that defendant was taking care of him, buying him things, giving him money. On cross-examination, Smith testified that she did not know where Bush's letters were. She testified that Bush never told her that he was receiving money from defendant, only that defendant was "looking out" for him, and that Bush never said that defendant wanted him to confess to a particular crime.

Defense counsel waived the production of the remaining witnesses, and the prosecution rested. Defense counsel then renewed his motion for a directed verdict, initially made after the jury was sworn, on the basis of absence of testimony establishing venue. The trial court stated that it would rule with regard to the motion after receiving briefs the following day. Defendant presented no witnesses. The next day, the court heard argument regarding the venue question. The court noted that the attempted obstruction of justice charge involved several acts and that one of them was that defendant intended to obstruct justice in the case pending against him in Wayne County. The court concluded that venue was proper in Wayne County for the attempted obstruction of justice count. The court questioned the propriety of venue for the inciting perjury count, but left open the question whether both counts were properly brought in Wayne County because they arose out of the same transaction. The court's ruling regarding this final issue is not before us. Nonetheless, it appears that defendant does not contest that if venue of the attempted obstruction of justice charge was proper,

the prosecution of both counts in Wayne County was proper.[1] The jury found defendant guilty of inciting perjury and not guilty of attempted obstruction of justice.[2] Defendant was sentenced to six months' to five years' imprisonment.

---

[1] The prosecution argues that defendant abandoned the venue issue by failing to order and provide the transcript of the sentencing, at which the trial court was to make its final ruling regarding the venue issue. The trial transcripts reflect the court's ruling regarding the attempted obstruction of justice count. The court reserved ruling only on the question whether venue was also proper regarding the inciting perjury count because both counts arose out of the same transaction. However, on appeal, defendant appears to concede that if venue with regard to either count was proper, the prosecution of both counts in Wayne County was proper:

> In finding that venue for both counts was proper in Wayne County, the trial judge ruled that venue was proper for the attempted obstruction of justice count, and that, through the "same transaction" test, venue was, therefore, also proper for the incitement to perjury count. While *People v White*, 390 Mich 245 [212 NW2d 222 (1973)], does hold that multiple charges growing out of the same transaction must be brought in a single criminal proceeding, the trial judge erred in ruling that venue was appropriate in Wayne County for the attempted obstruction of justice charge.

We thus conclude that the issue that was abandoned for failure to file the transcript—whether venue of the incitement to commit perjury count is proper as an adjunct to the attempted obstruction of justice count—is not challenged by defendant in any event.

[2] The crime that defendant was convicted of, inciting perjury, is defined at MCL 750.425; MSA 28.667 as:

> Any person who shall endeavor to incite or procure any person to commit the crime of perjury, though no perjury be committed, shall be guilty of a felony, punishable by imprisonment in the state prison not more than five years.

Perjury is defined at MCL 750.423; MSA 28.665 as:

> Any person authorized by any statute of this state to take an oath, or any person of whom an oath shall be required by law, who shall wilfully swear falsely, in regard to any matter or thing, respecting which such oath is authorized or required, shall be guilty of perjury, a felony, punishable by imprisonment in the state prison not more than fifteen years.

II

Defendant first argues that the trial court erred in holding that venue was proper in Wayne County because all the alleged acts giving rise to the charges occurred in Jackson County and because, unless otherwise prescribed by the Legislature, venue is proper only where the offense was committed.

A trial court's determination regarding the existence of venue in a criminal prosecution is reviewed de novo. See *People v Meredith (On Remand)*, 209 Mich App 403, 407-409; 531 NW2d 749 (1995). Venue is a part of every criminal case and must be proved by the prosecutor beyond a reasonable doubt. *Id.* at 408; *People v Belanger*, 120 Mich App 752, 755; 327 NW2d 554 (1982). Due process requires that trial of criminal prosecutions should be by a jury of the county or city where the offense was committed, except as otherwise provided by the Legislature. *People v Lee*, 334 Mich 217, 225-226; 54 NW2d 305 (1952). The indictment or information must state that the offense was committed in the county or within the

---

With regard to the attempted obstruction of justice charge, the jury was instructed regarding what constitutes an attempt and, regarding the obstruction offense, was instructed:

In order to show that the Defendant is guilty of obstruction of justice, the People would have to show beyond a reasonable doubt that the Defendant induced Ricardo Bush to commit perjury.

Second, the People would have to establish beyond a reasonable doubt that at the time of the inducement, the Defendant intended to hinder the due process of justice in the pending case in Wayne County known as the *People v Charles Fisher.* That case was pending from 1988 through 1990. And what they would have to show is that the Defendant intended to hinder the due course of justice in that case by the perjury of Ricardo Bush.

jurisdiction of the court. MCL 767.45(1)(c); MSA
28.985(1)(c).

The felony complaint in the instant case stated
under "place of offense," the Wayne Circuit Court, the
City of Detroit, and Jackson Prison. The complaint
stated under both counts that defendant's alleged acts
were intended to affect proceedings pending in
Wayne County. Although venue was properly alleged,
venue regarding the crimes charged is not statutorily
prescribed and we have found no Michigan cases
addressing the situs of the crimes of inciting perjury
and attempted obstruction of justice where the legal
proceeding intended to be affected is pending in a
county different from the county in which the alleged
acts took place. Guided by federal authority, we con-
clude that the trial court did not err in finding that
venue of the attempted obstruction of justice count
was proper in Wayne County, where the proceedings
intended to be affected were pending.

The majority of the United States Courts of
Appeals, including the Sixth Circuit, have held that in
obstruction of justice cases,[3] venue is proper in the

---

[3] A number of federal statutes fall under the obstruction of justice
rubric, including the predecessor version of 18 USC 1503, involved in the
cases cited as involving that section, with the exception of *United States
v Reed*, 773 F2d 477 (CA 2, 1985), and 18 USC 1512. The former version of
18 USC 1503 (1976) stated in pertinent part:

> Whoever corruptly, or by threats or force, or by any threatening
> letter or communication, endeavors to influence, intimidate, or
> impede any witness . . . or injures any party or witness in his per-
> son or property on account of his attending or having attended
> such court or examination before such officer . . . or corruptly, or
> by threats or force, or by any threatening letter or communication,
> influences, obstructs, or impedes, or endeavors to influence,
> obstruct, or impede, the due administration of justice, shall be
> fined not more than $5,000 or imprisoned not more than five years,
> or both.

district where the court proceeding affected is pending.[4] *United States v Frederick,* 835 F2d 1211 (CA 7, 1987) (involving a charge under a witness-tampering statute, 18 USC 1512); *United States v Reed,* 773 F2d 477, 483-484 (CA 2, 1985) (involving both perjury and obstruction of justice charges under 18 USC 1623 and 1503, respectively); *United States v Scaife,* 749 F2d 338, 346, 348 (CA 6, 1984) (involving a charge under 18 USC 1512); *United States v Johnson,* 713 F2d 654 (CA 11, 1983) (involving a charge under 18 USC 1503 of endeavoring to obstruct justice by kidnapping a friend of the informant); *United States v Barham,* 666 F2d 521 (CA 11, 1982) (involving a charge under 18 USC 1503 of endeavoring to obstruct justice by

---

Section 1503 was amended in 1982 to delete references to witnesses; attacks on witnesses are now covered by 18 USC 1512-1514. See n 5, *infra,* 63 Boston U L R 919, n 1 (1983). Section 1512 took effect October 12, 1982, and stated at that time in pertinent part:

(a) Whoever knowingly uses intimidation or physical force, or threatens another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—
(1) influence the testimony of any person in an official proceeding;

\*          \*          \*

shall be fined not more than $250,000 or imprisoned not more than ten years, or both.

Sections 1621 to 1623 are entitled Perjury Generally, Subornation of Perjury, and False Declarations Before Grand Jury or Court, respectively.

[4] All the cases cited in this paragraph were decided before the addition of a venue provision to 18 USC 1512, effective November 18, 1988, which provides:

(h) A prosecution under this section or section 1503 may be brought in the district in which the official proceeding (whether or not pending or about to be instituted) was intended to be affected or in the district in which the conduct constituting the alleged offense occurred. [18 USC 1512(h).]

attempting to persuade a witness to change his state-
ment and then shooting him); *United States v Kibler*,
667 F2d 452, 454 (CA 4, 1982) (involving a charge
under 18 USC 1503 of threatening a witness in an
endeavor to influence him to testify falsely in a pend-
ing criminal case); *United States v Tedesco*, 635 F2d
902 (CA 1, 1980), (involving a charge under 18 USC
1503 of endeavoring to induce a witness not to testify
fully). See also *United States v Manfredi*, 789 F Supp
961, 963-964 (ND Ind, 1992) (involving a perjury
charge under 18 USC 1621). As of this writing, appar-
ently only the Court of Appeals for the District of
Columbia Circuit maintains that venue is proper only
where the acts taken to obstruct justice occurred.
*United States v Swann*, 142 US App DC 363, 365; 441
F2d 1053 (1971).[5]

---

[5] The Eighth Circuit Court of Appeals, in *United States v Brakke*, 934
F2d 174 (CA 8, 1991), held that in a prosecution under 18 USC 1501,
which proscribes the obstructing, resisting, or opposing of any officer of
the United States serving, or attempting to serve or execute, any legal or
judicial writ or process of any court of the United States, venue is proper
where the acts of obstruction took place, and not where the process was
issued. *Brakke* is of limited relevance to the issue before us. The *Brakke*
court questioned whether § 1501 is an obstruction of justice statute and
found especially significant the fact that §§ 1503 and 1512 have a special
venue provision not contained in § 1501. The special venue provision
referred to by the *Brakke* court took effect in 1988 (see n 4, *supra*) and
played no part in the decision of the various federal cases on which we
rely.

In *United States v Hersch*, 850 F Supp 483 (ED Va, 1994) (conviction
vacated and remanded on other grounds in unpublished opinion of the
United States Court of Appeals for the Fourth Circuit, issued October 11,
1996, 1996 US App Lexis 26640), relied on by defendant, the court applied
*Kibler's* "verb test" to a perjury charge and concluded that venue was
proper only where the oath is taken or the false statements are made. We
conclude that *Hersch* has no application to the attempted obstruction of
justice charge. We also note that *United States v Nadolny*, 601 F2d 940
(CA 7, 1979), relied on by defendant, was overruled in *United States v
Federick*, *supra*.

That defendant was charged with *attempted* obstruction of justice, and not the completed offense, does not defeat venue in the county where the proceeding intended to be affected was pending.[6] *Reed, supra* at 486. We note that in the federal cases discussed, there was no requirement that the proceedings intended to have been affected actually were affected. In fact, the statute itself punishes the attempt. We see no meaningful distinction based on whether a defendant is successful in actually obstructing justice. What is important is that the offense is not committed unless there is an act done with the intent to obstruct justice in the county where the proceeding is pending.

In addition to the above federal authority, some state courts have arrived at the same result in cases involving perjury or tampering with a witness, finding venue proper in the county where the affected proceeding is pending, by relying on statutes providing that venue is proper in any county in which any of

---

For a thorough, although now outdated, discussion of the federal courts' formerly divergent approaches regarding proper venue in obstruction of justice cases brought under 18 USC 1503, see Anno: *Venue of prosecution for unlawfully influencing, intimidating, or impeding a federal officer, witness, or juror, under 18 USCS § 1503*, 64 ALR Fed 678, 679 (describing the two approaches as [1] that the locus delicti of the crime is the place where the actual physical acts occurred, and [2] that since the crime is the obstruction of justice, the location of its commission is in the district where the effect of the acts occur, the district whose due administration is affected). See also note, *Criminal venue in the federal courts: The obstruction of justice puzzle*, 82 Mich L R 90 (1983), and note, *Venue in Constructive Contempt Prosecutions Under 18 USC § 1503: An Act-Oriented Approach*, 63 Boston U L R 919 (1983).

[6] We also reject defendant's argument that venue is proper only in Jackson County, pursuant to MCL 768.6; MSA 28.1029 and MCL 768.7; MSA 28.1030, the latter of which provides that the circuit court for the county in which the prison where the crime or offense punishable by imprisonment in such institution occurred "shall have jurisdiction." This latter section does not preclude venue being proper in another county as well.

the requisite acts or effects occur. See Anno: *Construction and effect of statutes providing for venue of criminal case in either county, where crime is committed partly in one county and partly in another*, 30 ALR2d 1265, § 27, 1291, and Later Case Service Supp (1995), § 27, p 146 the annotation citing *People v Vario*, 165 Misc 842; 2 NYS2d 611 (Queens County Court, 1938) (applying a statute that provided that when a crime is committed partly in one county and partly in another, or the acts or effects thereof, constituting or requisite to the consummation of the offense, occur in two or more counties, the jurisdiction is in either county, the court held that a Queens County grand jury had jurisdiction to indict the defendant for inciting and attempting to procure a witness to commit perjury even though it was alleged that the incitement and attempt took place in Kings County, because the effects of the alleged acts were intended to take place in Queens County), and the later case service citing *State v Hall*, 26 Or App 17, 20; 552 P2d 272 (1976) (applying statutes that provided that "[i]f conduct constituting elements of an offense or results constituting elements of an offense occur in two or more counties, trial of the offense may be held in any of the counties concerned," Or Rev Stat 131.315(1), and "[i]f the offense is an attempt or solicitation to commit a crime, trial of the offense may be held in any county in which any act that is an element of the offense is committed," Or Rev Stat 131.315(8), the court held that venue regarding a charge of attempt to induce a witness in an official proceeding to withhold testimony was proper in the county where the official proceeding was pending).

Michigan has a similar statute, MCL 762.8; MSA 28.851, concerning a felony consisting of more than one act, to which the trial court indirectly alluded. That statute provides:

> Whenever a felony consists or is the culmination of two or more acts done in the perpetration thereof, said felony may be prosecuted in any county in which any one of said acts was committed.

While the Michigan statute does not use the words "effects" or "results," it has been similarly interpreted. In *People v Flaherty*, 165 Mich App 113; 418 NW2d 695 (1987), this Court applied the statute and affirmed the defendant's conviction of larceny by false pretenses, MCL 750.218; MSA 28.415, rejecting the defendant's argument that insufficient evidence was presented regarding venue because he never set foot in the county where he was tried. The defendant's insurance agency was located in Macomb County and he was tried in St. Clair County. The defendant had allegedly defrauded a general insurance agency, having accepted money from it for an insurance policy that was never issued. *Flaherty, supra* at 118-119. This Court noted that evidence was presented that the larceny was accomplished through mail and telephone communications that moved across county boundaries, and that some of these acts had their effects in St. Clair County, including the general agency's authorization of an invoice and placing of payment to the defendant in the mail. This Court stated "[w]e find no particular significance in the fact that defendant was physically present in Macomb County when he initiated the various communica-

tions. The effective false representation occurred in St. Clair County." *Id.* at 119.

Thus, in applying the statute, the place of commission of an act is not limited to the place of the defendant's physical presence. An act that has effects elsewhere that are essential to the offense is, in effect, committed in the place where the act has its effects. Here, the felony complaint stated Wayne County as one of the places of the offense and that defendant's alleged acts were intended to affect proceedings pending in that county. The obstruction charge required proof that defendant intended to hinder the due course of justice in the case pending in Wayne County. We conclude that venue was proper in Wayne County, where the proceedings intended to be affected were pending.

III

Defendant next argues that the trial court committed error requiring reversal in allowing hearsay testimony into evidence by permitting assistant prosecutor Reynolds to paraphrase testimony from defendant's prior murder trial and by allowing Docket and Smith to testify about statements made by Bush. We disagree.

Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c).

A

The trial court allowed Reynolds to paraphrase testimony from defendant's second homicide trial during the perjury trial, stating that the testimony was not

hearsay because it was not offered to prove the truth of the matter asserted, but only to show that the statements were made. Reynolds related testimony regarding the condition of the crime scene, what items were allegedly taken from the crime scene, the circumstances surrounding the crime, and the cause of the victim's death. Defendant argues that the statements were, in fact, offered for the truth of the matter asserted, because, in order for Bush to be regarded as credible, his version of events had to be shown to coincide with events as they actually occurred. We are not persuaded by this argument.

Before Reynolds' testimony, Bush testified that defendant provided him with details of the crime scene and the circumstances surrounding the crime so that Bush could confess to the murder of defendant's wife. Reynolds' account of the testimony at defendant's second trial was offered to show the consistency between the facts Bush testified that defendant related to him in prison and the facts as presented at the trial. The testimony was offered to show that Bush had gotten his information about the death of defendant's wife from defendant as part of a scheme by which defendant would be exonerated of his wife's murder. Reynolds' account of the testimony was offered only to show that the testimony was given, not that it was true. If the facts Bush claimed to have learned from defendant pursuant to the plan were consistent with the testimony at trial, it makes it more likely that defendant, who was present at trial, provided the information to Bush. The truth of the testimony at the murder trial is unimportant; what is important is that there was, in fact, testimony coinciding with Bush's testimony. Thus, the trial court did

not err in allowing Reynolds to relate testimony from defendant's prior murder trial because it was not offered to prove the truth of the matter asserted.

B

Eric Docket testified at trial that Bush told him that defendant wanted Bush to "take the case for him" and that Bush was "squeezing" defendant, which meant that Bush was to admit to murdering defendant's wife in exchange for money, but Bush never planned to "take the case." Before the admission of this testimony, to which defendant did not specifically object at the time, there was a lengthy colloquy regarding whether the prosecutor would be permitted to elicit testimony from Docket regarding Bush's statements to him. The discussion centered on whether Bush's statements to Docket were prior consistent statements, which are not hearsay under MRE 801(d)(1)(B). The court ruled that the prosecutor could rehabilitate Bush through prior consistent statements made to others. We conclude that the court did not err.

MRE 801(d)(1)(B) provides:

> A statement is not hearsay if—[t]he declarant testifies at the trial . . . and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.

Defense counsel cross-examined Bush extensively in an effort to establish that Bush benefited from his agreement with the prosecutor to testify in exchange for sentence credit. Defense counsel also asked:

*Q.* Now, when you wrote to them [the prosecutors], it
wasn't because you were outraged because somebody's
conviction was set aside, but that you saw this as an oppor-
tunity to get something for yourself; isn't that right?

*A.* No.

*Q.* You saw it as an opportunity to get something for
yourself, didn't you?

*A.* No, not really.

Thus, one of defendant's theories at trial was that
Bush had fabricated his claim in order to "sell some-
thing to the prosecutor" and that he had an improper
motive. Because Bush's statements to Docket were
made to a friend and preceded Bush's contact with
the prosecutor, they arguably preceded his motive to
fabricate. Therefore, Docket's testimony regarding
Bush's statements was not hearsay under MRE
801(d)(1)(B).

Further, on direct examination, Bush testified, with-
out objection, that Docket, Smith, and William Mundy
were aware of his dealings with defendant. On cross-
examination, defense counsel elicited testimony from
Bush that he admitted to Docket, Smith, and Mundy
that he was squeezing defendant, although Bush later
denied using the word "squeeze." Thus, the admission
of Docket's testimony, if erroneous, was harmless.

C

Christina Smith testified that she had received cor-
respondence from Bush stating that defendant was
"looking out for" Bush, which Smith interpreted to
mean that defendant was buying things for Bush or
giving money to Bush. For the reasons discussed
regarding Docket's testimony, we conclude that
Smith's testimony also was not hearsay under MRE

801(d)(1)(B) and that its admission was harmless in any event.

In addition, because the statement that defendant was "looking out for" Bush is consistent with defendant's theory at trial that he agreed to pay Bush to help him solve his wife's murder, its admission, if erroneous, was harmless for this reason as well.

IV

Defendant next argues that while paraphrasing the testimony from defendant's second murder trial, Reynolds improperly commented on the credibility of testimony favorable to the defense. Defendant further argues that during closing argument, the prosecutor both improperly commented on the credibility of Docket's testimony by characterizing it as "truthful" and misstated testimony.

This Court reviews claims of prosecutorial misconduct case by case, examining the pertinent portion of the record to evaluate the remarks in the context they were made. *People v Bahoda*, 448 Mich 261, 266-267; 531 NW2d 659 (1995); *People v Legrone*, 205 Mich App 77, 82; 517 NW2d 270 (1994). A prosecutor may not argue the effect of testimony that was not entered into evidence at trial. *People v Stanaway*, 446 Mich 643, 686; 521 NW2d 557 (1994). However, a prosecutor is free to argue the evidence and all reasonable inferences from the evidence as it relates to the prosecution's theory of the case. *Bahoda, supra* at 282.

A

During Reynolds' testimony at trial regarding the testimony from defendant's second murder trial, the following exchange occurred:

*Q. [Prosecutor]:* Was there testimony elicited at the trial relative to an alleged assault upon Dr. Fisher?

*A.* Yes, there was.

*Q.* And was there testimony relative to whether or not Dr. Fisher had been struck?

*A.* There was certainly a question about that, yes.

*Q.* Was there any indication during the course of the trial—

*The Court:* Excuse me. Your question was whether or not there was any testimony and not whether there were any questions about it. The witness's statement is stricken.

You can ask your question again.

*A.* I'm sorry, your Honor.

*Q. (Mr. Donaldson [prosecutor], continuing)* Was there any testimony about Dr. Fisher himself having been taped up?

*A.* There was testimony that Dr. Fisher claimed to have been taped up. And there were questions and testimony about the consistency of physical evidence to that—

*Mr. Mogill [defense counsel]:* May we approach the bench?

Following this exchange, the trial court excused the jury and cautioned Reynolds against expressing his opinion regarding the truth of the testimony he was paraphrasing. When the trial court asked defense counsel whether that addressed his objection, defense counsel further complained that Reynolds was giving his opinion by his demeanor, choice of words, and tone of voice. The trial court stated that it would not caution Reynolds regarding his demeanor because that was something the jury had to judge.

We agree that Reynolds' characterization of the truth or accuracy of the claim that defendant had been struck or taped was irrelevant and inadmissible, as was his assessment of other evidence presented at trial. The relevant issue is what testimony was presented at trial, which would make Bush's account

of what defendant told him in prison more or less credible, not the truth of the testimony. Nevertheless, Reynolds did not state that he had some special knowledge regarding whether the testimony was truthful. *Bahoda, supra* at 276-277. Defendant complains that Reynolds stated that during defendant's prior murder trial there was testimony that defendant *claimed* to have been taped up and that there were questions and testimony about the consistency of physical evidence. While this testimony was irrelevant, it does not rise to the level of error requiring reversal. *Id.* at 277.

Defendant also complains on appeal that when the prosecutor questioned Reynolds about the testimony at defendant's prior murder trial, he asked for a factual statement from Reynolds on many occasions, rather than asking if there had been testimony at trial with regard to each matter. However, on several occasions, the trial court interrupted the prosecutor, and corrected the form of the questions to reflect that they were directed to whether there had been testimony at the murder trial with regard to each matter. Because the trial court timely corrected the prosecution in front of the jury and the form of the questions did not indicate any special knowledge regarding defendant's guilt or innocence on the part of the witness or the prosecutor, we find no error requiring reversal. Further, the truth of defendant's testimony at the murder trial was not at issue in the instant case. The prosecutor's opinion regarding whether the testimony was truthful, even if conveyed, was irrelevant. We note that the prosecutor did not argue that defendant lied at his murder trial and the jury should

therefore conclude that he was lying in the instant case.

B

During the prosecution's closing argument in this case, the following exchange occurred:

*[Prosecutor, presenting argument]*: Let's get back to what this case is all about. Was there a relationship? That's almost conceded. Was there a transfer of money between Ricardo Bush and Dr. Fisher? Did he pay him money? Bush tells you that he did. Docket says that he did.

*Mr. Mogill*: Objection, Docket did not testify to that.

*The Court*: I'm going to overrule the objection. He's arguing what he believes the evidence tends to show. I remind the jurors that what the lawyers say is not evidence. What you heard from the witness stand is the evidence.

Defendant argues on appeal that this comment was improper because the only statements Docket made about Bush receiving anything from defendant were hearsay statements in which Bush allegedly claimed to have received money from defendant. Defendant argues that the prosecutor's statement led the jury to believe that Docket had personal knowledge regarding a transfer of money between Bush and defendant.

A prosecutor is free to argue the evidence and all reasonable inferences therefrom as it relates to the prosecution's theory of the case. *Bahoda, supra* at 282. On cross-examination, Docket testified that he never saw defendant exchange anything with Bush and never saw defendant giving Bush tokens. On redirect examination, the prosecution referred to this testimony and asked Docket if he knew tokens were paid to Bush by defendant. Docket testified that on one occasion, Bush had been without money, and the

next thing he knew, Bush had money. Docket testified that he asked Bush where the money came from, and Bush told him that it had come from defendant. Defendant did not object to this testimony. During closing argument, the prosecutor stated that Docket said that defendant paid Bush money, not that Docket personally observed such an exchange. We conclude this statement does not require reversal, especially in light of the court's cautionary statement.

C

Defendant also argues that the prosecutor impermissibly vouched for the credibility of Docket's testimony during his closing argument. The prosecutor stated:

> He didn't want to be here. I think it should be clear to you it wasn't until I boxed him in that he became truthful with you in terms of what he knew. Why?
>
> Well, use your common sense. You are a prisoner. Who is the enemy in prison. It's the People. You don't help the enemy. You don't do that. And if you do, you are taking some risks.
>
> What do you think it's like inside of a prison having come and testified against another inmate, someone who you share your life with? So, Docket's testimony props up Bush. And I promised him a letter outlining his cooperation in the case. Nothing more.
>
> There's absolutely nothing improper about that. And it's truthful. Christina Smith comes in, she says, I never met you before, Mr. [Prosecutor]. No promises here. Yeah, I knew about the scam before he ever started doing it.

We conclude that the prosecutor was arguing that the circumstances surrounding Docket's testimony explained his reluctance to testify and that his testimony was corroborated, which indicates he was

being truthful. We reject defendant's argument that this constitutes prosecutorial misconduct, because there was no implication that the prosecution had any special knowledge of Docket's credibility. *Bahoda, supra.*

D

Finally, defendant argues that the prosecutor engaged in misconduct by commenting on evidence that was not presented to the jury. During closing argument, the prosecutor stated:

> Mr. Mundy is the third person mentioned in the original statement given to the prosecutor's office that was conducted along with Docket and Smith. Mundy says, I don't want to say nothing. I don't even know. That is the normal reaction when an investigation is done by our office. I don't know nothing about nothing.

Defendant did not object to this comment at trial and, therefore, we will review only for a miscarriage of justice. *Stanaway, supra* at 686-687.

Special Investigator Kenneth May had earlier testified that he was unable to obtain a statement from William Mundy. Specifically, May testified on cross-examination that "the only thing that Mr. Mundy would say to me is I would rather not discuss it or I would rather not talk about it." Therefore, the statement complained of was merely a comment or recapitulation of testimony presented at trial. Under these circumstances, we conclude that failure to review this issue would not result in a miscarriage of justice.

V

With regard to the defendant's claims of error raised in his supplemental brief, we conclude that

Bush's credibility was properly left to the jury, the jury was fairly instructed, and defendant was properly charged.

Affirmed.

P. D. SCHAEFER, J., concurred.

HOLBROOK, JR., J., *(concurring).* I concur with the majority that defendant's conviction should be affirmed. I write separately to distinguish this case from *People v Meredith (On Remand),* 209 Mich App 403; 531 NW2d 749 (1995), in which I dissented from the majority's holding that MCL 762.8; MSA 28.851 provided a basis for venue in the prosecution of a conspiracy charge by the mere fact of a coconspirator's travel through the prosecuting county. *Id.* at 408-409. It remains my opinion that mere travel through a county, without more, does not constitute an overt act in furtherance of a conspiracy formed in another county. *Id.* at 416-417 (HOLBROOK, JR., J., dissenting). In this case, however, the nexus between defendant Fisher's felonious acts and the prosecuting county was not merely incidental or fortuitous, but, rather, was direct and substantial. As the majority in this case notes: "Here, the felony complaint stated Wayne County as one of the places of the offense and that defendant's alleged acts were intended to affect proceedings pending in that county." *Ante,* p 152. Thus, venue was properly established in Wayne County.

I concur in all other aspects of the majority opinion.