PEOPLE v KNOWLES

Docket No. 237245. Submitted March 12, 2003, at Grand Rapids. Decided March 25, 2003, at 9:15 A.M.

Donald S. Knowles was convicted by a jury trial in the Mason Circuit Court, Richard I. Cooper, J., of uttering and publishing, MCL 750.249, with regard to a stolen check. The defendant appealed, arguing that there was insufficient evidence to support his conviction, that his conviction should be reversed because of prosecutorial misconduct, and that the trial court misscored offense variable (OV) 9 of the sentencing guidelines in determining his sentence.

The Court of Appeals held:

1. The elements of uttering and publishing are: defendant's knowledge that the instrument was false, an intent to defraud, and presenting the forged instrument for payment. The defendant acknowledged possession of the check, and the victim testified that she never gave the defendant a check. Accepting the victim's testimony, the jury could reasonably have concluded that it was clear beyond a reasonable doubt that the defendant took the check without the victim's permission and was involved in having the check made payable to himself. Thus, there was sufficient evidence to show that the defendant knew the check was false. The defendant's father testified that the defendant asked him to cash the check, and his father did as requested. This was sufficient evidence that the defendant acted with the intent to defraud and that the check was presented for payment. There was sufficient evidence to support the defendant's conviction.

2. Any right to a new trial based on the prosecutor's comments regarding the defendant's right to testify, references to prior bad acts, and improper appeals to the jury for sympathy, was waived after the defense counsel indicated to the trial court that the defendant wished to continue the trial rather than moved for a mistrial.

3. The comments made by the prosecutor in closing and rebuttal to the effect that the defendant treated the victim badly but that she still loved him and that the defendant may have relied on the victim's fear of disclosing their relationship, were part of the prosecutor's argument that it was implausible that the victim would

have willingly given the defendant a check, and the argument with regard to why the defendant felt he could get away with taking the check from the victim. These were permissible arguments in light of the evidence and the arguments made by the defense.

4. The trial court did not err in scoring ov 9 of the sentencing guidelines at ten points for two victims, because there were two victims who directly suffered an injury as a result of the defendant's crime: the woman from whom the defendant obtained the check and the credit union that was wrongly deprived of the money as a result of the check being cashed and then returned for insufficient funds.

Affirmed.

SENTENCES — SENTENCING GUIDELINES — UTTERING AND PUBLISHING — VICTIMS.

A credit union that directly suffered financial injury as a result of the cashing of a fraudulent check was properly treated by a sentencing court as a victim along with the account holder for purposes of scoring a sentence for uttering and publishing under the sentencing guidelines (ov 9).

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, *Chris J. Van Oosterum*, Prosecuting Attorney, and *William E. Molner*, Assistant Attorney General, for the people.

State Appellate Defender (by *Fred E. Bell*) for the defendant.

Before: SCHUETTE P.J. and SAWYER and WILDER, JJ.

PER CURIAM. Defendant Donald S. Knowles was convicted by a jury of uttering and publishing, MCL 750.249.[1] He was sentenced as a fourth habitual offender, MCL 769.12, to a prison term of four to twenty-five years. He appeals as of right. We affirm.

Amanda Schroeder testified that she "met" defendant while she was in the county jail for drunken driving. Simply put, she explained that the bulk of

---

[1] The jury acquitted defendant of a charge of forgery.

their contact occurred through writing notes to each other that were passed by trusties.[2] She was released from jail before defendant, but indicated that she remained in contact with defendant through letters and telephone calls while he was still in jail. Schroeder testified that on December 28, 2000, which was the date defendant was released from jail, she met him at a Knights Inn in Grand Rapids where she paid for a room. Schroeder said that she and defendant went to the room where they "had a couple drinks" and had sex and that, after that, defendant told her he was going to the store, left the room, and did not come back. She testified that she spent New Year's Eve, December 31, 2000, at defendant's house and stayed until "probably about four, five o'clock that morning." She said she made defendant take her home because he was talking to "some girl" on the telephone for three hours. Schroeder said that she had her checkbook with her at the hotel on December 28 and when she was at defendant's house on December 31. However, she testified that she never gave defendant a check and that she never gave him a loan or offered to give him a loan. She also said that he never asked her for a loan. She further testified that she never gave defendant permission to use her checkbook.

Schroeder testified that at the time she was at the hotel with defendant, she was in a relationship with Francio Medina, whom she had been seeing "off and on" for nine years. She said she shared some of the problems in that relationship with defendant. Schroe-

---

[2] It seems that Schroeder and defendant had little opportunity for direct contact while they were in jail because of a general separation of male inmates from female inmates.

der testified that the checking account she had belonged to her and Medina. She also testified that she was informed that check number 540 from the checking account did not "clear," and that she looked through her checkbook and saw that she "was only on like 536, 537." She indicated that the check and carbon copy for number 540 were missing from her checkbook. Schroeder identified People's Exhibit 5 as check number 540, which was written for $225, signed with her name, and had written on it "loan." However, she said that she did not write any part of the check, and that her name was spelled incorrectly in the signature.

Defendant's father, Donald Knowles, Sr., testified that he thought People's Exhibit 5 was the check that he cashed for defendant. He indicated that defendant gave him the check and told him that defendant could not cash it because defendant did not have a bank account. He said that upon cashing the check in the amount of $225, he gave this sum to defendant. Defendant's father said that defendant told him that Schroeder was going to lend him some money. He testified that he repaid the credit union (where he cashed the check) the $225.

The vice-president of Safe Harbor Credit Union testified that defendant's father was an account holder at the credit union, and that on January 2, 2001, he cashed a check. The credit union's records reflected that this check was returned "marked NSF, nonsufficient funds."[3] The records also indicated that, on January 25 or 26, 2001, defendant's father repaid the

---

[3] Defense counsel stipulated that the check was cashed by defendant's father at Safe Harbor Credit Union.

credit union the $225 that he was given when he cashed the check, which meant that the credit union was without that money from January 2, 2001, until that repayment.

An accounting supervisor with Grand Rapids Consumer's Credit Union testified that its records reflected that Medina and Schroeder had a joint account at the credit union and that check number 540, in the amount of $225, was returned on January 3, 2001, because there were insufficient funds in the account.

Detective Susan Randall testified that she interviewed defendant, who said that Schroeder gave him the check at issue as a gift. When she asked him why the check had "loan" written on it, he "just looked kind of dumbfounded." Schroeder indicated that she went to visit defendant in jail in connection with the check that he took, and he told her "that he would explain everything to me after everything is done and over with." She further testified about defendant writing letters to her in February 2001 or later generally telling her that he loved her and that he was "sorry" and suggesting that she drop the charges. She also indicated that defendant told her to say that Medina told her that he would beat her up if she did not "blame it on [defendant]."

### I. UTTERING AND PUBLISHING

Defendant first argues that the evidence was insufficient to support his conviction of uttering and publishing because there was insufficient evidence that defendant knew the check was false or that he had the intent to defraud. We disagree. In reviewing

whether there was sufficient evidence to support a conviction, we view the evidence in a light most favorable to the prosecution to decide whether any rational fact-finder could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v Hunter*, 466 Mich 1, 6; 643 NW2d 218 (2002). The elements of uttering and publishing are: (1) defendant's knowledge that the instrument was false, (2) an intent to defraud, and (3) presenting the forged instrument for payment. *People v Hawkins*, 245 Mich App 439, 457; 628 NW2d 105 (2001). Notably, "a defendant's intent can be proved by circumstantial evidence." *Id.* at 458. As set forth above, defendant effectively acknowledged possession of the check at issue by claiming that it was a gift from Schroeder. However, Schroeder testified that she never gave defendant a check. Accordingly, accepting Schroeder's testimony on this point, the jury could reasonably have concluded that it was clear beyond a reasonable doubt that defendant took the check at some point during his encounters with Schroeder without her permission or knowledge, and was involved in having the check made out as payable to himself. Thus, there was sufficient evidence to show that defendant knew the instrument at issue (the check) was false. Defendant's father indicated in his testimony that defendant asked him to cash the check for defendant and that he did so. This was sufficient evidence that defendant acted with the intent to defraud either Schroeder or Medina as the holders of the relevant checking account and that, using his father as an intermediary, defendant presented the forged instrument for payment. Accordingly, we con-

clude that there was sufficient evidence to support defendant's conviction.

## II. PROSECUTORIAL MISCONDUCT

Defendant next argues that his conviction should be reversed on the basis that the prosecutor engaged in multiple instances of misconduct. First, defendant asserts that the prosecutor improperly remarked on his failure to testify in the course of making a hearsay objection. Defendant also argues that the prosecutor improperly attempted to introduce evidence of his prior bad acts when the prosecutor asked Detective Randall why a handwriting analysis was not performed in this case, and the detective began to answer with a reference to "several other instances." However, after the remark touching on defendant's right to testify and the answer by the detective referencing "other instances," the trial court essentially asked defense counsel if he planned to move for a mistrial. Defense counsel replied that he talked to defendant and that defendant "indicated that he wants to continue this trial." Accordingly, we conclude that defendant waived any right to a new trial based on prosecutorial misconduct that may have occurred before defense counsel's indication that the trial should continue. See *People v Carter*, 462 Mich 206, 219; 612 NW2d 144 (2000) (holding that, where defense counsel "clearly expressed satisfaction with the trial court's decision to refuse the jury's request and its subsequent instruction," a claim of error with regard to those matters was waived). This waiver extinguished any possible error in this regard. *People v Riley*, 465 Mich 442, 449; 636 NW2d 514 (2001).

Defendant also claims that the prosecutor improperly appealed to the jury for sympathy for the complainant throughout the trial. A number of these incidents occurred before the above-referenced statement by defense counsel to the trial court that defendant wished to continue with trial. We conclude that any claim by defendant that he should be granted a new trial with regard to those incidents was waived by his indication that he wished to continue with the trial. This leaves for our consideration only certain remarks made by the prosecutor in closing and rebuttal argument. Defendant did not object below to the argument in question; thus, appellate relief is available only for plain error that resulted in the conviction of an actually innocent defendant or that seriously affected the fairness, integrity, or public reputation of judicial proceedings. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). However, even if the propriety of the argument in question had been preserved by objection below, we would find no basis for relief.

Defendant refers to remarks by the prosecutor in closing argument reflecting Schroeder's testimony that defendant left her at the motel and spent three hours on the telephone while she was at defendant's home. However, in context, these remarks were part of an argument by the prosecutor that it was implausible that Schroeder would have voluntarily given defendant the check after he treated her badly. This was permissible argument from the evidence because "a prosecutor is free to argue the evidence and all reasonable inferences from the evidence as it relates to the prosecution's theory of the case." *People v Fisher*, 220 Mich App 133, 156; 559 NW2d 318 (1996).

Defendant also refers to remarks by the prosecutor in rebuttal argument to the effect that defendant may have relied on Schroeder not wanting her involvement with defendant to come to Medina's attention in writing the check out to himself. Again, this was rational argument from the evidence to explain why defendant might have felt that he could have gotten away with making the check at issue payable to himself without Schroeder reporting him for stealing the check. Defendant vaguely asserts that the prosecutor denied him a fair trial by indicating throughout closing and rebuttal argument that defendant used, abused, and "dumped" Schroeder and that she still loved him. We conclude that defendant has shown no error requiring reversal. We note in particular that "[a] prosecutor's comments must be considered in light of defense arguments." *People v Messenger*, 221 Mich App 171, 181; 561 NW2d 463 (1997). In his closing argument, defense counsel referred to Schroeder having visited defendant in jail after the incident underlying this case and asked rhetorically, "Does this sound like a woman to you that is very upset about a check?" To the extent that the prosecutor remarked on Schroeder still loving defendant despite the way he treated her, this was relevant to explain, in answer to defense counsel's remarks, her continuing contact with him even though, in the prosecution's view of the case, he stole a check from her.

### III. SENTENCING GUIDELINES

Finally, defendant argues that the trial court misscored offense variable (OV) 9 of the sentencing guidelines at ten points for two victims. Defendant asserts that the court incorrectly treated the credit union at

which defendant's father cashed the check as a victim (in addition to treating Schroeder as a victim).[4] We disagree. As set forth above, the records of Safe Harbor Credit Union reflected that, as a result of defendant's father cashing the check at issue, the credit union paid out $225 and was without that money for a period. "MCL 777.39(2)(a) specifically states that, in scoring the variable, the trial court must '[c]ount each person who was placed in danger of injury or loss of life as a victim.' " *People v Kimble*, 252 Mich App 269, 274; 651 NW2d 798 (2002). Contrary to defendant's argument, the trial court properly treated the credit union as a victim because it was placed in danger of, and in fact suffered, financial injury in being wrongly deprived of $225 for a period as a direct result of defendant's crime. We note that defendant states in his brief that there is no authority for separately assessing points for "insurance carriers" and others "indirectly touched" by a crime. However, this contention is wrong. While we assume for purposes of discussion that those who are only indirectly harmed by a crime should not be considered victims for purposes of OV 9, the credit union was directly harmed by the crime of which defendant was convicted in this case. As a direct result of defendant's crime, the credit union wrongly paid $225 to defendant's father. This is not analogous to, for example, a health insurer being indirectly harmed by paying for medical treatment resulting from a physical attack on an assault victim. The credit union wrongly lost the use of $225 for a period after paying it out. While it appears

---

[4] At some points, defendant refers to the credit union as a "bank" in his brief.

undisputed that defendant's father repaid the credit union the $225, this does not change the fact that the credit union was a victim because it wrongly lost the use of that money for a period. Thus, we affirm the trial court's scoring of OV 9.

Affirmed.