SOUTHWICK, P.J., for the Court.
¶ 1. Edward Holbrook, Jr. was convicted of attempting a burglary, arson, and a murder. On appeal he alleges that his motion to suppress should have been granted, that venue was improper and that there was error in finding him to be an habitual offender. We find no error and affirm.
¶2. Holbrook and his wife Kathy Hol-brook were divorced in October 2001. After the divorce, Mr. Holbrook lived at Sen-atobia Lakes in Tate County, Mississippi. His former wife moved in with her sister, Sandra Beard, and later moved into her own place in Batesville, Panola County, Mississippi. Ms. Holbrook worked at her sister’s store in Batesville.
¶ 3. Tony Watts became acquainted with Edward Holbrook through their work. Watts also lived in Senatobia. At trial, Watts testified that Holbrook left a note for him at his home on November 16, 2001. In response to the note, Watts and his wife Tammy went to Holbrook’s home. Hol-brook told his visitors that he was divorced but that he loved his former wife and wanted her back. He also stated that his former wife’s sister was to blame for the divorce. Holbrook explained that he wanted to “rob and burn” his former sister-in-law Sandra Beard’s store. While the store was burning and attention was diverted, he then wanted to burn Beard’s home. Hol-brook asked Mr. Watts to help by driving him to Beard’s home and store. Holbrook showed Watts a spray container. He planned to use this container to spray the buildings with gasoline before he lit them on fire.
¶4. The men then took Mrs. Watts home. Holbrook and Watts then drove to Panola County. Holbrook pointed out the store that he wished to rob and burn. Holbrook then directed Watts to his ex-wife’s home. He said that he was going to set Ms. Holbrook’s car on fire and the fire would then spread to her house. He said that his former wife would have to escape the fire through her bedroom window. The two men then went to the sister-in-law’s home. Holbrook wanted to set fire to her home in order to kill her. After this tour, the two men went back to Hol-brook’s home.
¶ 5. When Watts returned to his own home at approximately 2:00 a.m., he told his wife what had happened. Watts called the Federal Bureau of Investigation later that morning. The FBI instructed Watts to notify local authorities. Watts discussed Holbrook’s plan with the Batesville Police Department. Watts explained that Holbrook planned to commit the arson that night. The police equipped Watts with a body wire. Once he went back home, Watts found a note from Holbrook requesting Watts to come to his home. Watts notified police and then went to Holbrook’s home.
¶ 6. After Watts arrived, Holbrook filled a sprayer with fuel and then tested it in his yard. Holbrook then put the sprayer and a black jug of gasoline in Watts’s vehicle. The two left for Batesville. As they were driving to Batesville, the fumes from the black jug became overwhelming. Holbrook threw the jug out of the car. The men then came upon a road block set up by the State Highway Patrol. The men went through the road block and then on to Senatobia. As they approached the interstate highway, local authorities stopped and arrested both men. The arrest took place in Tate County prior to the pair’s arrival in Panola County.
¶ 7. Watts’s description of the place in which the black jug had been thrown from the vehicle led to the jug’s recovery. Taken from Watts’s vehicle were the spraying device containing a little more than a gal- *528 Ion of gasoline, gloves, and other items. Holbrook’s yard in Senatobia Lakes was found to be burned in one area. A test was conducted that established gasoline was used to start the fire. Mrs. Watts’s account of the notes left at her home and the conversation she witnessed between her husband and Holbrook corroborated her husband’s account of events.
¶ 8. One of Holbrook’s fellow Panola County Jail inmates, Jerry Brimmer, testified that Holbrook told him of his plans for robbery and arson. Brimmer quoted Hol-brook as admitting that he planned to burn down the Holbrook and Beard homes. Holbrook was found guilty of attempted burglary, attempted arson, and attempted murder. He was sentenced as an habitual offender to life imprisonment without parole.
DISCUSSION

1. Evidence seized by law enforcement officers

¶ 9. Holbrook argues that there was error when the trial court denied his motion to suppress evidence seized by law enforcement officers. Two separate searches of his home were conducted. Holbrook contends that the actual search warrants contained numerous mistakes. He further contends that there was no probable cause for issuance of the search warrants.
¶ 10. At the hearing on the motion, the justice court judges who issued the warrants testified. They had been told in sworn statements by officers about the underlying facts and circumstances, and from these determined that there was probable cause. However, the warrants that were issued were not completely accurate. Some of the blanks on the form warrant were left blank.
¶ 11. The errors in the search warrants are clerical and do not rise to the level necessary -to invalidate them. Williams v. State, 583 So.2d 620, 625 (Miss.1991). These warrants were issued after sworn statements were made to impartial judges; the judges found that probable cause existed. There was no confusion or prejudice to Holbrook caused by these clerical errors.
¶ 12. Holbrook claims that probable cause did not exist to support the issuance of the warrants. “Probable cause for issuance of a search warrant is present when facts and circumstance within the officer’s knowledge, or of which he had reasonable trustworthy information, are sufficient in themselves to justify a man of average caution in the belief that a crime has been committed and that a particular individual committed it.” Hall v. State, 455 So.2d 1303, 1304 (Miss.1984). An appellate court determines whether the issuing magistrate had a substantial factual basis for the conclusion that probable cause existed. Lee v. State, 435 So.2d 674, 676 (Miss.1983).
¶ 13. Law enforcement officers first obtained a warrant to search for and seize a videotape of a conversation between Holbrook and his former wife, a tape that the defendant had played for Mr. and Mrs. Watts. We have little doubt that probable cause existed to believe that this tape existed, but regardless, the items seized as a result of that search warrant were never offered into evidence. A second warrant was obtained in order to search the Holbrook home concerning conviction records from Tennessee. Ms. Hol-brook informed officers that she had seen these papers at her home during her marriage. This was probable cause for issuance of the second warrant.

2. Venue in Panola County

¶ 14. The most significant issue on this appeal is the proper venue for an attempt *529 to commit a crime when all the overt acts occur in one county and the planned but never completed crime was to occur in another county. Here, Holbrook resided in and was arrested in Tate County. However, the site of the fires he planned to start and the store at which the robbery was to occur were in Panola County. While venue would have been proper in Tate County, the State brought the case in Panola County. As we will explain, we conclude that, in most cases, charges may be brought in either the county in which the overt acts for an attempt occur or the county in which completion of the crime had been intended.

Constitutional provisions

¶ 15. The authors of the United States Constitution were sufficiently concerned about the location in which criminal charges are to be brought that the matter was addressed in two different sections:
The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.
U.S. Const, art. Ill, § 2, cl. 3. This provision applies only to the operation of the federal judicial power under Article III. However, the Sixth Amendment to the Constitution also provides this:
In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law....
U.S. Const, amend. VI. Most of the Sixth Amendment has been found applicable to the states through the effect of the Fourteenth Amendment. See Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (jury trial); Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (compulsory process and public trial); Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967) (speedy trial); Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (confront witnesses); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (counsel). The venue (locale for charges and trial) and vicinage (locale from which jurors drawn) provision has not been found to be fundamental and has not been incorporated into state process.
¶ 16. Even so, the Mississippi Supreme Court held that the Sixth Amendment’s venue requirement applies to state prosecutions. Miss. Publishers Corp. v. Coleman, 515 So.2d 1163, 1165 (Miss.1987) (citing principally Gideon, 372 U.S. at 342, 83 S.Ct. 792, which only incorporated the right to counsel). The Mississippi court cannot make this part of the Sixth Amendment apply in other states’ courts, but it has the power to require application in Mississippi courts. See also Johnson v. State, 476 So.2d 1195, 1209-10 (Miss.1985) (assumes that Sixth Amendment venue applicable).
¶ 17. The Mississippi Constitution requires that in “criminal prosecutions, the accused shall have a right to ... a speedy and public trial by an impartial jury of the county where the offense was committed .... ” Miss. Const, art. 3, § 26 (1890). The Coleman decision likely should be read to mean that federal interpretations of the Sixth Amendment are to be consulted for understanding the state constitution. Indeed, the Mississippi Supreme Court has concluded that the venue rights under the two constitutions are “similar.” State v. Caldwell, 492 So.2d 575, 577 (Miss.1986).
*530 ¶ 18. Since the Sixth Amendment venue and vicinage rules have in a few Mississippi cases been found applicable to Mississippi practice, we should examine the federal caselaw. A frequently applied test for determining venue under the federal constitution is this:
a review of relevant authorities demonstrates that there is no single defined policy or mechanical test to determine constitutional venue. Rather, the test is best described as a substantial contacts rule that takes into account a number of factors — [1] the site of the defendant’s acts, [2] the elements and nature of the crime, [3] the locus of the effect of the criminal conduct, and [4] the suitability of each district for accurate fact finding. ...
U.S. v. Reed, 773 F.2d 477, 481 (2d Cir.1985) (brackets and numbers added.) This test must be modified somewhat in light of recent authority, as we will discuss.
¶ 19. The Reed court said that no debate existed that the “site of the defendant’s acts” would be a proper jurisdiction in which to bring charges. Id. The other elements of the four-part test “are also important, however, and often give sites other than where the acts occurred equal standing so far as venue is concerned.” Id.
¶ 20. In Reed, the charge was lying under oath during a deposition taken in San Francisco for a civil case that was pending in New York. “In the present case, the perjury outlawed ... must be in an ongoing federal judicial proceeding, or ancillary thereto, which may be pending in a district other than where the oath is taken.” Id. There were some practical reasons why venue should be in New York for perjury that occurred in California. “Where essential elements of a crime are related to the integrity of the proceedings of judicial tribunals in districts other than where the acts took place, for example, those tribunals should not be left to the generosity of prosecutors or judges in other districts to defend their powers.” Id.
¶ 21. On the third factor, which was the locale of the effects of the crime, the court found that many federal criminal statutes permitted charges to be brought in the district in which the effects were felt. Id. at 482. Mississippi Code section 99-11-19 is such an authorization under Mississippi law as will be discussed below. We will return to this issue, as it is applicable in the present appeal.
¶ 22. The final consideration in Reed was “the suitability of the district for accurate fact finding,” which would be determined by “scrutinizing the definition of the crime and the likely location of evidence of such crimes generally,” not the location of the evidence in the specific charges against the defendant. Id.
¶ 23. In Reed, the court found that the perjury could be charged either in New York or California. New York was appropriate for the California deposition perjury since “the locus of the intended effects of the alleged criminal conduct was in the Southern District of New York because the alleged perjury was intended to affect the outcome of an action pending there.” Id. at 483.
¶ 24. Reed has been influential in resolving venue issues:
Reeds analysis finds support in numerous federal lower court rulings that have held venue to be appropriate in more than one district, notwithstanding statutory verbs that might easily have been interpreted as pointing to a single situs for the crime. This group includes rulings under [ ] false statements provision ..., fraud provisions, and the prohibition against bail jumping. Elements of *531 the Reed analysis also are found in state court rulings and state venue provisions.
WayNE R. LaFave, JeRold H. IsRael, & NanCY J. King, 4 Crim. PROC. § 16.2(d) (2d ed.2003) (footnotes omitted).
¶ 25. These authors point out that recent United States Supreme Court authority has qualified the Reed test, but the qualification leaves the venue of the effects of this crime as an appropriate one in which to bring charges. In one recent precedent, the accused was charged with a federal money-laundering offense in Missouri. United States v. Cabrales, 524 U.S. 1, 118 S.Ct. 1772, 141 L.Ed.2d 1 (1998). All the acts of the money laundering had occurred in Florida, but the money had allegedly been acquired through illegal drug activities that took place solely in Missouri.
¶ 26. The court first reaffirmed an earlier stated test: “the locus delicti must be determined from the nature of the crime alleged and the location of the act or acts constituting it.” Id. at 6-7, 118 S.Ct. 1772, quoting United States v. Anderson, 328 U.S. 699, 703, 66 S.Ct. 1213, 90 L.Ed. 1529 (1946). The venue statute discussed by the court stated that offenses “begun in one district and completed in another” may be “prosecuted in any district in which [the] offense was begun, continued, or completed.” Cabrales, 524 U.S. at 7, 118 S.Ct. 1772, quoting 18 U.S.C. § 3237(a). The problem for the court was that money-laundering was an accessory after-the-fact crime. The launderer did not need to be involved in the illegal conduct that created the funds in need of cleaning; all that was necessary was that the person seeking to remove the taint from the money be aware that they had been derived from specified unlawful activity. Id. at 7-8, 118 S.Ct. 1772. Therefore this defendant could not be prosecuted in the district in which the illegal fund was created. Cabrales was charged in a venue which had no connection to any relevant element of the crime.
¶ 27. The next year the Supreme Court elaborated on the Cabrales principles. The court defined the issue as being “whether venue in a prosecution for using or carrying a firearm ‘during and in relation to any crime of violence,’ ... is proper in any district where the crime of violence was committed, even if the firearm was used or carried only in a single district.” United States v. Rodriguez-Moreno, 526 U.S. 275, 276, 119 S.Ct. 1239, 143 L.Ed.2d 388 (1999). The nature of the offense involved both the carrying of a weapon and the committing of a crime of violence. Both are essential elements to be proven about the defendant’s conduct. The defendant began the kidnaping in Texas without a weapon, then drove his victim to New Jersey, then later moved with his victim to Maryland where he for the first time acquired a weapon. Texas, New Jersey, Maryland and every other state traversed in the kidnaping tour were proper districts for the prosecution. Id. at 281-82, 119 S.Ct. 1239.
¶ 28. The court in a footnote refused to rule on the issue of whether venue could be brought in the district in which the effects of the crime were felt.
The Government argues that venue also may permissibly be based upon the effects of a defendant’s conduct in a district other than the one in which the defendant performs the acts constituting the offense. Brief for United States 16-17. Because this case only concerns the locus delicti we express no opinion as to whether the Government’s assertion is correct.
Id. at 279 n. 2, 119 S.Ct. 1239. What the Supreme Court avoided we must confront. Here, the effects of the crime, if it had been successful, would have been felt in Panola County.
*532 ¶29. After Cabrales and Rodriguez-Moreno, the Sixth Amendment requires consideration of “the nature of the crime alleged and the location of the act or acts constituting it” in order to determine the proper venue for charges. The four-part test from Reed which includes examining effects would apply if the effect is part of the nature of the crime or of the acts constituting it.
Cabrales ... [along with Rodriguez-Moreno ], cast doubt on the continuing acceptability of the substantial contacts approach as broadly construed. In particular, the analysis of Cabrales would appear to reject establishing venue by reference to the locus of the effect where that effect is not made an element of the crime.
Wayne R. LaFave, JeRold H. Israel, & Nancy J. King, 4 Crim. ProC. § 16.2 (text accompanying notes 82.2 & 82.3) (emphasis added) (footnotes omitted). The authors went on to say that “Cabrales and Rodriguez-Moreno emphasized the need to look to elements of the crime in determining the nature of the crime.” Id. at text accompanying note 82.9. The crime before us has as a necessary element that there be an intended effect of an arson in a specific location. Applying the LaFave analysis of Cabrales, the locus of the effect of this crime therefore is proper for venue.
¶ 30. The State assumed that necessary evidentiary burden in the indictment. This arson was described in two counts as the intent to commit arson of the dwellings of two specifically named persons in Pano-la County. The intent to commit the arson of those specific structures was an integral part of the crime charged. When all that is committed are the overt acts of an attempt, acts that might independently be innocent of criminal content, an indispensable component of the attempt is that it was directed towards committing a specific crime that was blocked before completion. Thus to use the Cabrales terminology, the “nature of the crime alleged” required not just the overt acts in one county, but the purpose to which those acts were directed in the other county.
¶ 31. Consequently, even though Cab-rales narrowed the breadth of the Reed test, Holbrook’s case remains within the acceptable boundaries of constitutional venue. The effect in Panola County of this attempted arson is the sine qua non of the criminal nature of the acts that Holbrook committed, making the location of the effect integral to the crime and a proper venue for charges.
¶ 32. This principle is constitutional; it is also practical. The county in which innocent acts are performed may have a limited interest in prosecuting. It is the county in which the substantive crime would have been committed had it not be interrupted that would have the greater interest. Here, this would be Panola County rather than Tate County.
¶ 33. An example of the operation of this principle is in a Michigan case. The court found that a “majority of the United States Courts of Appeals ... have held that in obstruction of justice cases, venue is proper in the district where the court proceeding affected is pending.” People v. Fisher, 220 Mich.App. 133, 146-17, 559 N.W.2d 318, 324-25 (1996) (footnote omitted). “An act that has effects elsewhere that are essential to the offense is, in effect, committed in the place where the act has its effects.” Id. at 152, 559 N.W.2d at 327. That analysis applies here too. For obstruction of justice, where justice would have been obstructed is a proper venue. For attempted arson, the location of the structure is a proper venue. Cab-rales did not undermine using the venue of effects when they are an element of the *533 crime. Rodriguez-Moreno, 526 U.S. at 279 n. 2, 119 S.Ct. 1239.
¶34. These cases are discussing the Sixth Amendment limits for federal prosecutions. As already pointed out, the Mississippi Supreme Court has held that an accused’s rights to a “public 'trial by an impartial jury of the county where the offense was committed” under the state constitution is “similar” to the rights granted by the Sixth Amendment. Cald-ivell, 492 So.2d at 577. There is no reason to conclude that the state constitution alters the requirements of the Sixth Amendment. Prosecution in Panola County satisfied both the state and the federal constitutions.

Mississippi statutes

¶ 35. Regardless of what the state or federal constitution might permit as venue for criminal charges, further limits might arise from statute. An independent issue then is whether there is a state statute that would allow charges to be brought in the county in which the structure to be burned is located, even when all the overt acts that were committed occurred in an adjacent county. The general venue statute provides that the “local jurisdiction of all offenses, unless otherwise provided by law, shall be in the county where committed.” Miss.Code Ann. § 99-11-3(1) (Rev. 2000).
¶ 36. An elaboration on the meaning of “committing a crime” comes from another statute:
When an offense is committed partly in one county and partly in another, or where the acts, effects, means, or agency occur in whole or in part in different counties, the jurisdiction shall be in either county in which said offense was commenced, prosecuted, or consummated, where prosecution shall be first begun.
Miss.Code Ann. § 99-11-19 (Rev.2000). The Supreme Court in describing this statute said that the “legislature as early as 1857 enacted an exception to this general rule” of bringing charges in the county in which the crime was committed. Rogers v. State, 266 So.2d 10, 16 (Miss.1972). We take exception to labeling this an “exception.” “Clarification” is the clearer terminology. What it means to “commit an offense,” superficially a simple question, becomes more complicated upon understanding the varied situations in which the issue arises. Section 99-11-19 addresses those variations and does not create exceptions to the constitution. The helpful statutory language is that commission includes the “acts, effects, means, or agency” of the crime.
¶ 37. The elements of the crime of attempt are “1) an intent to commit a particular crime; 2) a direct ineffectual act done toward its commission; and 3) the failure to consummate its commission.” Burney v. State, 515 So.2d 1154, 1158 (Miss.1987). Watts’s testimony established Holbrook’s intent to start these fires. It also established that he had acted towards its commission. Holbrook had arranged transportation to Panola County and had purchased supplies to use in the arson. The crimes failed when he was arrested while still en route.
¶ 38. The acts of the crime up until it was thwarted in the attempt stage occurred in Tate County. The effects and perhaps the means of the crime had the arson been performed would have been in Panola County. The substantive crime of arson was never committed. Instead, the inchoate crime of an attempted arson occurred. An attempt to commit a crime requires overt acts beyond mere preparation for the crime, and further requires that the accused have failed to commit the *534 substantive crime itself. Miss.Code Ann. § 97-1-7 (Rev.2000).
¶ 39. An attempt to commit a crime in which its completion would have to occur in one particular county raises the question that faces us today. Is the county in which the crime would have occurred but for its earlier interception a proper one under this statute in which to bring the charges for the attempt? The LaFave treatise again provides a useful explanation:
Common law rulings have found troublesome the application of the territorial principle to inchoate offenses. As to attempts, one view is that the attempt has the same situs as the completed offense would have had if the defendant were successful, so that attempted murder is committed at the place where the victim is missed rather than where the defendant does his act.
Wayne R. LaFave, Jeeold H. IsRael, Nan-Cy J. King, Criminal PROceduRE § 16.4 (2003) (footnotes omitted). Under this view, charges for an attempt to commit an arson in Panola County could statutorily be brought in Panola County. A similar approach was taken in another recognized criminal law treatise: “It is clear that such attempt is cognizable in the place where, if not interrupted, it would have been executed; and from the very nature of things, it must be cognizable in the place the preliminary overt acts constituting the attempt are committed.” 1 Wharton’s Criminal Law, at 317-18 § 234 (12th ed.1932) (footnote omitted, citing English common law cases).
¶ 40. There is nothing conceptually outrageous or bizarre in bringing charges in Panola County for attempting to burn a building in Panola County. For inchoate crimes, the identifiable effects are in the county in which the crime would have been committed. Knowledge that an arson was attempted, like knowledge that a murder or an assault was attempted, creates anxiety and notoriety in the county and neighborhood of the planned arson. To change the facts, if the failed attempt was directed towards burning an entire neighborhood, or a substantial structure like a church or public building, or murdering an entire family or blowing up an occupied school, the effects in the locale of the intended crime would be palpable. Downsizing the crime that was attempted also downsizes the effects, but it is logical to conclude that effects still exist. Like a court action in one state that was intended to be but never was obstructed by a perjured deposition taken in another state, it is the situs of the intended effects that may have the better claim to prosecution. Reed, 773 F.2d at 481.
¶ 41. This is not to say that fear created by crime is a sufficient effect to bring charges in any county in which substantial publicity about the crime is given. It does mean that when the locus of the intended crime is not in the county in which the overt acts of the attempt are committed, the county of the intended crime still has an acutely focused association with the attempt. This justifies concluding that there are effects in the latter county. In that sense, the conduct which the criminal laws of the state have been adopted to prevent has sufficient repercussions in the county of the intended effects that some part of the crime.can be said to have been committed there. In fact, the overt acts sufficient to prove the attempt are often innocent conduct, i.e., they may not themselves constitute a crime. Here, the Tate County overt acts of obtaining the equipment to be used for the arson and starting on the road to Panola County are criminal only because they were beyond mere preparation for committing a crime in Panola County. Therefore, the acts that were planned for *535 Panola County are indispensable to the criminality.
¶42. Whether the target buildings in Panola County are seen as the effects or the means of the crime, there was the right under section 99-11-19 to bring the charges in Panola County. Consequently, we affirm the decision of the trial court.

3. Sentence as an habitual offender

¶ 43. Holbrook argues that the State failed to prove that he was an habitual offender. See Miss.Code Ann. § 99-19-83 (Rev.2000). Holbrook objected to the State’s evidence of his habitual offender status as hearsay and his objection was overruled.
¶ 44. Information concerning Hol-brook’s prior record was obtained pursuant to a search warrant. This information established that Holbrook had been convicted of two or more felonies in Tennessee on charges separately brought and arising out of separate incidents at different times, that he was sentenced to and served separate terms of one year or more in Tennessee’s penal institutions and that one of his prior convictions was a crime of violence, aggravated assault. Holbrook meets the definition of habitual offender under the statute.
¶ 45. At his sentencing hearing, Hol-brook asserted that since his past sentences were served concurrently, he never served time on his conviction for aggravated assault. The fact that his sentences were served concurrently does not erase the fact that he was given two separate sentences. Bogara v. State, 624 So.2d 1313, 1320 (Miss.1993).
¶ 46. Holbrook further claims that his indictment did not properly charge him as an habitual offender. That is incorrect. Count 5 of the grand jury’s January 2002 indictment charged him as an habitual offender.
¶ 47. THE JUDGMENT OF THE CIRCUIT COURT OF PANOLA COUNTY OF CONVICTION OF COUNT I ATTEMPTED BURGLARY OF A BUSINESS, COUNTS II AND III ATTEMPTED ARSON, AND COUNT IV ATTEMPTED MURDER AND SENTENCE OF LIFE ON EACH COUNT AS AN HABITUAL OFFENDER IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH SENTENCES TO RUN CONCURRENTLY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PANOLA COUNTY.
McMILLIN, C.J., MYERS, CHANDLER and GRIFFIS, JJ. CONCUR. THOMAS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J., BRIDGES, LEE AND IRVING, JJ.